Whitaker, Judge,
delivered the opinion of the conrt:
This is a suit by plaintiff for compensation for the unlicensed use of its patent on an oil burner, and also of its patent on a “stove structure” containing a similar oil burner, with the modifications and attachments necessary to fit it into a regulation Army wood-burning stove, and with the modifications to prevent it from smoking, whether burning at extreme low or pilot heat, intermediate heat, or high heat.
In August 1942 the Army requested plaintiff to undertake to convert its wood- and coal-burning tent stoves into oil-burning stoves that would not emit smoke. By May of the following year plaintiff submitted for testing such a converted stove. It was satisfactory to the Army with certain *11 modifications, and in the following June the Army requested a license under plaintiff’s patents. This was not granted at the time.
In the following September, the Army notified plaintiff it was to be awarded a contract for 74,620 of these burners, and the Army again requested a license. No response having been received from plaintiff, the Army wired it a few days later that the award would be withdrawn unless the license was received forthwith. A free license under plaintiff’s patents was then granted.
In the former hearing of this case the question presented was the duration of this patent license, which had been granted for the duration of the war and six months thereafter. Defendant contended it was good until six months after the treaty of peace was signed with Japan. Had defendant’s position been upheld, it would not have been liable to plaintiff for the claimed infringement of its patents on the burners purchased, some from plaintiff and some from others, after the outbreak of hostilities in Korea, as plaintiff claims in this suit. However, we held the license expired in 1946, six months after the cessation of hostilities in World War II.
Having thus been deprived of its defense that it had a license to use plaintiff’s patents, defendant now says the patents are invalid. It also says it did not infringe them; but the latter cannot be so if plaintiff’s patents are valid, because the Army purchased and used the very thing plaintiff had developed for it, and on which plaintiff had secured a patent.
The first question is the validity of the patents.
It should be here said, parenthetically, that defendant could not have asserted its claim of patent invalidity, if its claim that it had a license from plaintiff at the time it purchased the burners in question had been sustained. Its demand and acceptance of a license estops it to assert invalidity; it is an implied confession of validity. Harvey Steel Company v. United States, 38 C. Cls. 662, 685 (1903), affirmed in 196 U. S. 310 (1905); also see Automatic Radio Mfg. Co., Inc. v. Hazeltine Research, Inc., 339 U. S. 827 (1950), 85 USPQ 378, 381. But, since we have held its *12 license bad expired, defendant has at least a technical right to assert this defense, even if it might be said that it cannot in good grace do so.
When plaintiff received the Army’s request to convert its wood- and coal-burning tent stoves to oil-burning stoves that would not emit smoke, plaintiff undertook to adapt the burner on which it already had a patent[1] for use in the Army stove. This oil burner consisted of a pot in which there were rows of air inlet holes from top to bottom, and what is called a frusto-conic baffle,[2] with a hole in the center thereof. At the bottom of the pot there was an intake for oil. The top was enclosed with a lid which had an opening in the center. Just below the top of the pot there was a row of larger holes for the inlet of what is called secondary air. The combustion at high heat takes place above the top of the pot, and at low or pilot heat, within the pot.
The claims of the patent upon which plaintiff relies specify a frusto-conic baffle plate within the pot, and specify that it shall be placed above the lower row of holes and with the rim of the opening in the center of the baffle plate in substantially the same horizontal plane as the second row of holes above the bottom of the pot. Claim 3 of the patent said that the baffle plate within the pot “substantially” closed it. Claim 4 differed only in that it said that there was “a substantial clearance between the outer periphery of the plate and the wall at the time of starting the burner.”
This is a simplified description of the oil burner that was used by plaintiff in converting the Army tent stove from wood or coal to oil.
The purpose of the frusto-conic baffle within the pot was to permit the burner to operate smoke-free at very low or pilot heat.
This burner is quite similar to a burner disclosed in a patent issued to Valjean prior to the issuance of plaintiff’s patent. So far as we can tell, the differences in the two burners are that the baffle in the Valjean patent is placed between the second and third rows of the holes in the lower part of the *13 pot, instead of between the lowest row of holes and the second lowest row, and that the baffle plate is flat, instead of being frusto-conic, as in plaintiff’s patent. Defendant relies particularly on the Valjean patent to show that plaintiff’s patent was anticipated by the prior art.
The patent examiner thought the differences pointed out aboye were an improvement over the Valjean patent, and allowed plaintiff’s patent. There is a strong presumption in favor of the validity of any patent issued by the Patent Office. The burden is on the alleged infringer to show that the patent is anticipated by the prior art. It has not convinced us that it is, although the two structures are indeed quite similar.
The commissioner of this court, who was present at the tests of burners constructed in accordance with both the plaintiff’s patent and the Valjean patent, has found that plaintiff’s patented burner in fact was more efficient when burning at low or pilot heat than the Valjean patent burner. We have no reason to doubt the accuracy of this finding.
The commissioner in his opinion concludes that the Val-jean patent does not anticipate plaintiff’s patent. We concur in this opinion, and hold that patent No. 2,182,465 (hereinafter referred to as the ’465 patent) is not anticipated by the Valjean patent, nor by any other prior art cited by the defendant.
We do not discuss the other prior art except to say that, whereas in some of the prior art cited the baffle plate was placed between the first and second rows of holes in the burner pot, and in others a conic-type baffle was used instead of a flat baffle, none of the prior art used just that combination which plaintiff used, to wit, the placing of the baffle between the first and second rows of holes, and a frusto-conic baffle. Just why this combination worked better than the previous patent is not obvious to us, but the patent examiner thought it did, and our commissioner has found as a fact that it actually did; hence, we find that plaintiff’s ’465 patent was not anticipated by the prior art, and we hold it to be valid.
When the Army called on plaintiff to convert its wood- and coal-burning stoves into oil-burning stoves, plaintiff *14 started out with its ’465 patent, and modified it so it would fit in an Army stove, and modified it so as to prevent it from smoking when operated at either low, intermediate, or high heat, and, further, provided it with attachments which would secure it in the Army stove. On the resulting combination, plaintiff secured patent No. 2,393,282, which will be hereinafter referred to as the ’232 patent. The burner used in this patent was identical with the ’465 burner, except that plaintiff added to the ’465 burner a tubular member running from the bottom upward through the middle of the pot and extending above the top of it. At the top of this tubular member there was placed a cap, raised slightly above the top of the tubular member, the cap having sides extending downwardly on each side of the tubular member. The purpose of the tubular member was to bring in a third source of air, and the purpose of the cap at the top was to direct this air downwardly, spreading the flame, and assuring sufficient combustion to eliminate the emission of smoke.
Attachments for fitting this pot within the regulation Army tent stove were provided, with directitons for the placing of these attachments at specific parts of the stove. A diagram of this stove and burner appears below.

*15

*16 This is the burner and attachments which the Army ordered from plaintiff in 1943. It is the burner and attachments on the use of which defendant demanded the license from plaintiff as a condition of placing with it an order for some 75,000 units; It is the burner which the Army has purchased and had available for use since the expiration of the license granted. A diagram of the stove actually used by the Army follows:

*17 Defendant says the ’232 patent is anticipated by the prior art. The art on which defendant mainly relies was considered by the patent examiner, and was found by him not to anticipate plaintiff’s ’232 patent. The commissioner of this court has also found that the prior art cited does not anticipate plaintiff’s patent.
It will be remembered that this device was specifically designed to fit in a particular stove and was designed to be used in the field under battle conditions. None of the prior art cited by defendant could have been used in an Army tent stove in the field under battle conditions. None of them had been adapted for use in the regulation Army stove, and most of them were supplied by forced air fed into the burner by a motor-driven blower. No burner that depended upon forced air driven into the burner by a motor could have been used in the Army tent stove in the field under battle conditions. They do have a number of points of similarity, but they could not have been used by the Army without considerable modification.
The “proof of the pudding” is that the Army asked plaintiff to develop a burner for use in this particular stove under certain conditions, and plaintiff did so, to the satisfaction of the Army, and the Army used this particular burner. We do not think the Army is in any position to say that the prior art anticipated this patent. Nor do we see how this can be said when plaintiff’s patents and the prior art are laid side by side and consideration is given to the use which defendant intended to make of it.
In the foregoing discussion we have couched our opinion in everyday language, which we hope the average man can understand. For a more technical discussion of the subject we refer to the commissioner’s opinion.
The matter of reasonable compensation is, as usual, a difficult matter.
As the commissioner says in his opinion, the royalties received under voluntary licensing agreements are often the best guide. But, since the ’232 patent, which defendant infringed, was a heater adapted for use under unusual conditions in a particular stove not in commercial use, no license agreements had been entered into for the use of this par *18 ticular patent. However, the heater used in this stove was an adapted model of plaintiff’s ’465 patent, and plaintiff’s ’465 patent was an improvement over the Valjean patent, which plaintiff also owned by assignment. Five licenses under the Valjean patent were in evidence. For them plaintiff received royalties ranging from 10 cents per unit to 25 cents per unit, based upon 700,000 units. The average royalty was 17.11 cents.
This was. the average royalty for use of the Valjean patent. As stated, the ’465 patent was an improvement over the Valjean patent, and the ’232 patent, which was infringed by defendant, was an improvement over the ’465 patent. For this reason plaintiff could justifiably demand for it a higher royalty. Another consideration justified a higher royalty. This patent was on a heater used in a stove that was not in commercial use, thus narrowing the market for it to a particular customer.
These considerations, we think, justify a royalty of 25 cents per unit. In order that plaintiff may have “reasonable and entire compensation” for the use, there must be added thereto a sum computed at 4 percent per annum for the period the royalty payments were withheld, which means that interest would run from December 31 of each year involved until date of payment.
So computed, plaintiff is entitled to recover the sum of $146,580.50 for the purchase of 586,322 units from persons other than plaintiff. A judgment for this amount, together with interest as set forth in the conclusion of law, will be entered.
It is so ordered.
Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
Laramore, Judge, took no part in the consideration and decision of this case.
FINDINGS OE FACT
The court, having considered the evidence, the report of Commissioner Donald E. Lane, and the briefs and argument of counsel, makes findings of fact as follows:
*19 1. This is a patent suit arising under the provisions of Title 28, U. S. C. Section 1498. Plaintiff seeks compensation for unauthorized use by or for the defendant of United States Letters Patent Nos. 2,182,465 and 2,393,232 issued on December 5, 1939, and January 22,1946, respectively, to Oil Devices, a limited partnership of Illinois. Plaintiff is a corporation organized under the laws of the State of Delaware, with its principal place of business at Santa Fe, New Mexico, and is successor in business of said Oil Devices. The parties have stipulated that plaintiff herein is the owner of the entire right, title and interest in, to, and under the two above-identified patents, including any right to recover for the past infringement thereof.
2. This case was before this court in 1954 on the sole issue-of validity and duration of a license. In an opinion delivered June 8, 1954, the court decided that the royalty-free license granted by Oil Devices to defendant and to remain in force “for the duration of the present war and the period of six months thereafter only” was valid but expired six months after the surrender of Japan on September 2, 1945. The parties have stipulated that plaintiff’s claim is now based on all contracts for accused devices let subsequent to January 1,1950, and up to and including a contract awarded September 23,1954, to George Henry Company.
3. The patents in suit relate to improvements in a burner for liquid fuel and to the incorporation of an improved liquid fuel burner in a stove structure suitable for heating Army tents and shelters. The burners may be characterized as gravity-feed, oil-vaporizing, pot-type burners. The burners are adapted to function with natural draft and to function at both high and low rates of fuel feed.
PATENT 2,182,465
4. The earlier Breese patent in suit, No. 2,182,465, hereinafter referred to as the ’465 patent, resulted from an application for patent filed March 18,1937. The specification of the ’465 patent states that the improvement has for a purpose the provision of a hydrocarbon burner that can be turned down to a small fire which may have the function of a pilot light for maintaining combustion during periods when a *20 minimum heat or no beat is desired. The construction disclosed in the ’465 patent is illustrated by the following reproduction of figure 1 of the patent drawings.
Dec. 5,1939 2,182,465
J. L. BKEESE
Burster eor Liquid Fuel
Filed March 18,1937

Kef erring to the drawing, the burner comprises a combustion chamber or pot 7 supported by the inner shell 2 in a furnace or heater 1 by an annular horizontal partition 3. The pot 7 has a closed bottom 8 into which oil fuel is supplied by pipe 10. A removable baffle 5 having a central aperture 6 partially closes the top of the pot 7. The cylindrical side of the pot 7 is provided with several rows of air inlet apertures designated by the numerals 16, 17 and 18. A removable baffle ring 19 is supported within the pot 7 by a plurality of legs 22. The baffle ring 19, sometimes called a pilot ring or pilot, is frusto-conic in shape, and has a central aperture as shown. When the burner is cold, there is clearance between the outer edge of the conic pilot ring 19 and the side of the *21 pot 7. Normal expansion of the ring when it heats np decreases the clearance. The conic pilot ring 19 is located just above the row of air inlet apertures 18, and the rim of the central aperture of said ring 19 is positioned substantially in the same horizontal plane as the row of air inlets 17 next above the lowermost row 18. The ’465 specification states that liquid fuel in the bottom of the pot 7 is vaporized by the heat of combustion already going on. When used at full fuel capacity, primary air is supplied by the air inlets 17 and 18, the mixture of fuel and air receives secondary air through the air inlets 16, and combustion takes place above the upper baffle 5. When used at minimum fuel' rate or pilot rate, primary air is supplied by the air inlets 18 below the pilot ring 19, and secondary air supplied by the air inlets 17 provides a combustible mixture which burns with a low flame within the pot 7.
5. Plaintiff has elected to rely on claims 3 and 4 of the ’465 patent. Claim 3 reads—
(3.) A burner for liquid fuel and the like, including a combustion chamber having a generally cylindrical side wall and a bottom portion, means for supplying a liquid fuel to the bottom of said chamber, said wall having a plurality of air inlets located in generally horizontal vertically spaced rows, a generally frusto-conic baffle plate supported within the chamber intermediate. top and bottom thereof, and substantially closing it, said plate having a central aperture, the rim of said central aperture terminating m substantially the same horizontal plane as the row of air inlets next above the lowest row, the lowest row of air inlets being in communication with the space below said baffle plate.
Claim 4 is like claim 3 but adds the following clause thereto:
* * * the baffle plate being so disposed with respect to the combustion chamber wall that there is a substantial clearance between the outer periphery of the plate and the wall at the time of starting the burner.
6. Claim 3 of the ’465 patent is supported by the disclosure of the patent specification, and may be read on the patent drawing as follows:
A burner for liquid fuel and the like, including—
a combustion chamber [7] having a generally cylindrical side wall and a bottom portion [8], *22 means [10] for supplying a liquid fuel to the bottom [8] of said chamber [7],
said wall having a plurality of air inlets [16] [17 and 18] located in generally horizontal vertically spaced rows,
a generally frusto-conic baffle plate [19] supported [22] within the chamber [7] intermediate top and bottom thereof, and substantially closing it,
said plate [19] having a central aperture, the rim of said central aperture terminating in substantially the same horizontal plane as the row of air inlets [17] next above the lowest row [18],
the lowest row [18] of air inlets being in communication with the space below said baffle plate [19].
7. Claim 4 of the ’465 patent is also supported by the disclosure of the patent specification, and may be read on the patent drawing as set out in the previous finding, adding thereto:
* * * the baffle plate [19] being so disposed with respect to the combustion chamber [7] wall that there is a substantial clearance between the outer periphery of the plate [19] and the wall [7] at the time of starting the burner.
This clearance is described in the specification of the ’465 patent as follows:
When the conic ring or baffle 19 is cold, there is a considerable clearance between the outer edge of the ring and the wall 7 of the heater. This gives ideal starting conditions for the burner as it allows the circulation of air from above into the space between the outer edge of the ring and the side wall of the burner. When the burner has gotten into operation and the ring heats up, the normal expansion of the ring decreases the clearance between the outer edge of the ring and the side of the wall 7 which is very desirable for the best operation of the burner under pilot light conditions. In other words, it cuts off the downward circulation of air between the outer edge of the cone 19 and the wall 7 and the substantially sole air supply to the pilot light zone is then the primary air supply passing through the apertures 18.
8. The ’465 patent illustrates and describes the conic baffle or pilot ring 19 as formed from an annular piece of sheet metal having a radial cut so that the portions adjacent the cut may be overlapped and secured. This construction gives *23 the pilot ring its conical shape, and permits the amount of overlap to be selected to determine the effective diameter of the ring and hence determine the clearance between the ring periphery and the wall of the burner pot. The specification also mentions that employment of a conic ring substantially eliminates the tendency to warp.
9. During its pendency in the United States Patent Office, the Breese patent application filed March 18,1937, and which resulted in the ’465 patent, presented various claims which were rejected as not patentable over various prior patents. Claims were canceled without prejudice and in view of other claims inserted by amendment. Claims complying with certain suggestions made by the patent examiner were inserted, were allowed, and are now claims 1 and 2 of the -’465 patent. Claims 3 and 4, here in suit, are like said claims 1 and 2, hut recite, as an additional limitation, that the baffle plate is frusto-conic. An application to reissue the patent in suit and to have it substituted in a then pending interference proceeding was denied.
10. Defendant urges that claims 3 and 4 of the ’465 patent are invalid over the disclosures of prior patents, knowledge and use. Defendant’s notices of prior art indicated reliance on the nine domestic and foreign patents previously cited in the Breese application file for the ’465 patent, plus three additional patents, and three alleged public uses. In its requested findings, defendant relies on the following items:
Valjean,_ 2,073,270_ Filed July 23, 1934.
Motor Wheel Oil Heat, page 6__ Published August 1933.
Space Heater.
Motor Wheel Oil Heat, page 60_ Published September 1933
Space Heater.
Underwriters’ Lab. File MP-Issued June 22, 1936.
Labs. 1029.
Underwriters’ Lab. File MP-Issued August 19, 1936.
Labs. 1061.
Cooper_ 2,244,766_ Filed August 8, 1936.
Issued 19, 1931.
Price et al_ 1,177,801_ Issued April 4, 1916.
11.Valjean patent 2,073,270 was cited by the patent examiner against the Breese ’465 application. Valjean discloses a space heater including a vaporizing type oil burner which is illustrated in the following reproduction of a portion of figure 1 of the patent drawings.
*24 March 9,1987
2,073,270
B. VALJEAN
Combustion Apparatus
Filed July 23, 1934

The burner comprises a combustion chamber 11 having a side wall 26 and a pan-like bottom 27 supported in a jacket 12. Liquid fuel is supplied by a pipe 41. The wall 26 is provided with five vertically-spaced rows of air inlets 37 of substantially uniform size and spacing. A partition 34 formed of cast metal is supported on an annular bead 35 between the bottom and top of the chamber 11. The flat partition 34 has a central opening 36 in alignment with the opening 29 in the top wall 28. The Valjean specification states that the partition 34 makes the lower portion of the chamber 11 a burner within a burner and prevents eddy currents from entering the lower part of the burner chamber. This is said to assure stable operation of the burner at low fire. The flat partition 34 of the Valjean construction is not frusto-conic, does not have the rim of the central aper *25 ture terminating in substantially the same horizontal plane as the row of air inlets next above the lowest row, and does not have substantial clearance between the outer' periphery of the partition 34 and the annular bead 35 of the wall 26. The Valjean patent issued to the Motor Wheel Corporation, Lansing, Michigan.
12. The Motor Wheel space heater illustrated in both of the Oil Heat publication citations appears to include a burner chamber having a flat partition positioned in accordance with the teachings of the Valjean patent. The text and illustrations in these publications are relatively vague as to details of construction, and are no more pertinent to the claims in suit than the Valjean patent of record.
13. The Underwriters’ Laboratories’ files describe oil-burning stoves and burners presumed to have been manufactured by Michigan Tank & Furnace Corporation for Lochinvar Corporation, and by Michigan Tank and Galvanizing Co. for Sears, Roebuck and Company in 1936. The Lochinvar oil-burning stoves described and illustrated in Lab. File No. MP-1029 include flat cast-iron baffle plates supported within the fire pot by iron rivets or by an annular bead. This disclosure is not substantially different from and is no more pertinent than the Valjean patent of record mentioned above. The Sears, Roebuck and Company domestic oil burner described and illustrated in Lab. File' No. MP-1061 includes two flat cast-iron baffle plates supported within the fire pot on annular beads. The central aperture of each baffle plate and the periphery of each baffle plate are illustrated as having a flange or bead, the flange or bead extending downward in one drawing and extending upward in another drawing. This meager disclosure of substantially flat baffles is likewise no more pertinent than the Valjean patent of record.
14. Cooper patent 2,244,766 was not cited by the patent examiner against the Breese ’465 application, and issued one and one-half years after the issuance of the ’465 patent, although filed earlier. Cooper discloses an oil burner which is illustrated in the following reproduction of a portion of figure 1 of the patent drawings.
*26 June 10, 1941
2,244,766
C. L. COOPEE
Oil Burner
Filed Aug. 8, 1936

Eeferring to the drawing, the Cooper oil burner comprises a cylindrical bowl 10 supported in stove casing by an annular partition 12. Oil from a supply pipe 13 flows by gravity to fibrous wick material 20 in the bottom of the bowl 10. The side wall of the bowl 10 is provided with air inlet apertures 31 arranged in vertically spaced rows. Flat annular vanes 24 and 25 are supported within the bowl 10 by rods 29 and pins 30. The vanes 24 and 25 are said to have outside diameters slightly less than the internal diameter of the bowl 10, so that the vanes fit loosely in the bowl to reduce the heat conduction between the vanes and the bowl wall. Helically disposed vanes 28 extend between the vanes 24 and 25. The Cooper specification states that the vanes improve the general efficiency and capacity range of the burner in that the vanes become highly heated, function as baffles and radiants to vaporize the oil, and promote turbulence in the burning gases. The flat vanes taught *27 by Cooper are no more pertinent to the ’465 patent claims in suit than the flat baffle of the Val jean patent of record. The Cooper disclosure is merely cumulative to the cited Valjean patent disclosure.
15. Sturgis patent 1,806,566 was cited by the patent examiner against the Breese ’465 application. Sturgis discloses three oil burners, and that illustrated in the following reproduction of figure 1 of the patent drawings is typical.
Mav 19, 1931
1,806,566
W. B. STUBGIS
Oil Burner
Filed Nov. 1,1928

Keferring to the drawing, the cylindrical burner pot 10 is supported within the shell 11 by the annular partition 12. A central air tube 13 extends upward through the center of the pot 10. Oil is supplied to the bottom of the pot 10 through pipe 21. A plurality of air inlets 16 is arranged in vertically spaced rows in the wall of the pot 10, and a row of air inlets 17 is provided in the upper end of tube 13 below the closure or cap 15. An upwardly convergent cone-shaped ring 18 is provided near the top of pot 10 just below the level of the inlets 17. Another similarly shaped ring 19 of greater inside diameter is positioned beneath the ring 18 and just below the level of the uppermost row of air inlets 16. The conic rings 18 and 19 at the upper end of the *28 pot 10 function to deflect upwardly moving air and oil vapors inwardly toward the central tube 13 for mixing with additional air from the inlets 17. The cited Sturgis patent specification does not mention operation at low or pilot rates of fuel feed. The conic deflector ring of the Sturgis construction does not have the rim of the central aperture terminating in substantially the same horizontal plane as the row of air inlets next above the lowest row and does not have clearance between the outer periphery of the rim and the wall of the burner pot.
16. Price and Brown patent 1,177,801 was not cited by the patent examiner against the Breese ’465 application. The Price, et al. patent discloses a burner for solid fuel such as paraffin, and for use particularly in connection with fumigating apparatus. The burner disclosed by this patent is illustrated in the following reproduction of figure 2 of the drawings.
J. PRICE & A. W. BROWN
BURNER
Application Filed Dec. 16, 1915
1,177,801
Patented Apr. 4, 1916

*29 Referring to the drawing, the cup 10 is for fuel and supports a wick 11. Air inlets 6 are provided in the lower portion of shell 1. Member 3 is in the shape of a shallow inverted cup and has a central aperture and has a plurality of small openings spaced a short distance from the central aperture. The shell 1 is provided with a plurality of rows of openings 2 and is closed at the top by a receptacle 14 intended to contain fumigating material. The Price, et al. burner is not intended for operation on liquid fuel at high, intermediate and pilot rates of fuel feed. The structure disclosed does not provide a baffle plate having the rim of the central aperture terminating in substantially the same horizontal plane as the row of air inlets next above the lowest row, and does not provide a baffle plate allowing substantial clearance between the outer periphery of the plate and the wall of the burner.
17. All other prior patents cited by the patent examiner against the ’465 patent application, and other prior patents, and alleged prior knowledge and uses cited by defendant in its notices of defenses, are of no more pertinence to claims 3 and 4 of the ’465 patent than the items set forth in finding 10.
18. During the trial, plaintiff demonstrated the operation of one of plaintiff’s oil burners in an Army tent stove. The burner was operated on gasoline fuel first with a frusto-conic baffle plate of the type disclosed in the ’465 patent. The burner was later operated with a flat baffle plate of the type disclosed in the Val jean prior art patent. Analysis of the products of combustion by a smoke recorder indicated that substantially no smoke was produced by either baffle at high rates of fuel feed. At a given rate of low or pilot level rate of fuel feed, the use of the flat baffle produced measurable smoke whereas the conic baffle did not produce measurable smoke. Defendant at a later date demonstrated the operation of similar oil burners in tent stoves in an outdoor tent .at Natick, Massachusetts. A burner having a conic baffle was operated beside a burner having a flat baffle. Laboratory-type recorders were used to compare temperatures, fuel feed, and smoke produced. These tests indi *30 cated no substantial difference between the conic baffle burner and the flat baffle burner at high rates of fuel feed. At low fire or pilot rates of fuel feed, these tests at Natick indicated that the burner having the conic baffle could be turned to a lower fuel feed before smoking than could the flat baffle burner. The burner with the conic baffle operated substantially smokeless at a fuel rate approximately twenty percent less than the lowest rate on which the flat baffle burner would operate smoke-free.
19. A drawing showing the Breese split ring pilot light in conical form and prepared by plaintiff’s predecessor, Oil Devices, was dated February 18,1937. Such pilot lights for use in pot-type burners were made at Columbus Metal Products, Inc., Columbus, Ohio, plaintiff’s manufacturing agent, and were shipped to stove manufacturers starting on March 10,1937. The Breese ’465 patent application was filed eight days later, on March 18,1937. The ’465 patent application, at the time it was filed, clearly disclosed the invention recited in claims 3 and 4. The drawing filed as a part of the application shows a construction corresponding exactly to the recitals of said claims. Claims 3 and 4 of the ’465 patent, when read in the light of the patent specification and the drawings which form a part thereof, adequately and distinctly describe and claim invention in such full, clear, concise, and exact terminology as is required by the patent statutes.
20. The baffle pot combination described and defined in claims 3 and 4 of the ’465 patent differs from the baffle pot combinations disclosed in the prior art. The differences are not the result of mere mechanical skill. The differences between the subject matter of claims 3 and 4 and the disclosures of the prior art are not such that the subject matter as a whole would have been obvious, at the time the invention was made, to a person having ordinary skill in the oil burner art.
21. Claims 3 and 4 of the ’465 patent are valid and patentable over the prior disclosures urged and relied on by the defendant.
*31 PATENT 2,393,232
22. The later Breese patent in suit, No. 2,393,232, hereinafter referred to as the ’232 patent, resulted from an application for patent filed May 10, 1943. The specification of the ’232 patent states that the improvement has for a purpose the provision of a burner of maximum simplicity which may be used, for example, as a tent stove burner for camping or Army use. Other stated objects include the provision of means for supplying tertiary air to such a burner and for spreading the flame, and the provision of means for applying a pot-type burner to a small demountable stove or heater. The construction disclosed in the ’232 patent is illustrated by the following reproduction of figure 1 of the patent drawings.
*32 Jan. 22, 1946
2,393,232
J. L. BREESE
Stove Structure
Filed May 10, 1943

Beferring to the drawing, the lower member of a conventional portable stove or heater is indicated by the numeral 1. Besting upon the upper edge 4 is an intermediate supporting ring 5. The upper stove member 9 rests on the flange 7 of member 5. A stove top 10 rests on the upper member 9, and is *33 provided with a removable closure 12 and a stove pipe connection 14. A pot-type oil burner assembly is supported within the stove by a tubular member 18 resting on the ring 5. The burner pot 23 is suspended from the flange 21 secured to the top of member 18. The burner pot 23 includes a closed bottom 25 and a fuel inlet connected to supply pipe 38. A conical pilot ring or baffle 40 is mounted on studs 41 secured to the pot wall 23. A flame ring 29 is mounted at the top of the burner pot 23. A central air tube 31 extends upward from the bottom 25 through the aperture 42 of the pilot ring 40 and through the central aperture 30 of the flame ring 29. A cap 35 is secured to the top of the air tube 31 to direct air downwardly toward the aperture 30. The pot wall 23 is provided with air inlets 26 below and above the pilot ring 40, and is provided with air inlets 27 near the underside of the flame ring 29. Additional air inlets 22 are provided in the supporting flange 21. When the ’232 patent stove structure described above is in operation, oil fuel controlled by a suitable valve flows at a selected rate into the bottom 25 of the pot 23. When the burner is operated at a low or pilot rate of fuel feed, air for combustion supplied by the stove opening 3 enters the pot 23 through the air inlets 26. Oil on the bottom 25 is vaporized by radiant heat from the fuel burning above the aperture 42 of the pilot ring 40. Vaporized fuel mixes with primary air drawn through the inlets 26 below the pilot ring 40. As the mixture passes above the pilot ring 40, secondary air for the combustion is drawn into the pot through air inlets 26 above the ring 40. The low fuel pilot light combustion and flame is substantially within the pot 23 between the rings 40 and 29. When the burner is operated at intermediate or high rates of fuel feed, the combustion flame is above the flame ring 29 and is spread out or flattened by tertiary air supplied through the central tube 31 and cap 36. During such intermediate and high-fire operation, primary air is supplied to the vaporized fuel by all air inlets 26, and secondary air is drawn in through the larger inlets 27 near the top of the pot. Tertiary air is supplied through the inlets 22 in the flange 21, as well as by the inlets 37 defined by the cap 36. The patent specification indicates that the structure described nrovides for a completely combustible *34 mixture of vaporized fuel and air both at minimum or pilot rate of flow and at the high-fire stage of fuel flow, and that there is a minimum of carbon deposit or soot. The conic pilot light baffle or ring 40 is similar to that disclosed in the ’465 patent in suit described in finding 4.
23. Plaintiff has elected to rely on claims 3, 5 and 6 of the ’232 patent. Claim 3 reads as follows:
3. In a demountable stove and pot type, burner therefor, a lower stove section, defining an air inlet space, and having a circumferential side wall with an air inlet aperture therein and an open top, an intermediate, inwardly extending partition ring removably mounted upon the upper edge of said lower stove section, said partition ring having a central aperture, an upper stove section removably mounted upon said partition ring, the upper stove section having a circumferential wall and a closed top defining a combustion space, an air directing sleeve mounted upon and upwardly extending from said partition ring, and a burner pot supported on said sleeve and inwardly spaced therefrom, a transversely extending partition connecting said sleeve and pot, the space between said sleeve and pot being in communication with the air space within the lower section, the wall of the pot being provided with a plurality of primary and secondary air inlet apertures, and means for delivering tertiary air directly into the combustion space.
Claim 5 is like claim 3, but defines the “means for delivering tertiary air directly into the combustion space” as — •
* * * including an air duct extending upwardly through the pot and in communication with the space below the bottom of the pot, said air duct terminating at a level above the level of admission of the secondary air, and a hood mounted on the upper end of said duct and adapted to deliver tertiary air therefrom downwardly toward the mixture passing upwardly through the top of the pot.
Claim 6 is like claim 3, but omits reference to the delivery of tertiary air. Claim 6 defines the location of the “primary and secondary air inlet apertures” as—
* * * the wall of said pot having therein a plurality of primary air inlet apertures located at various levels, and having a plurality of secondary air inlet apertures located adjacent the upper edge of the pot, all said aper *35 tures being in communication with the space within' the lower section below the lower end of said sleeve * * *.
and includes a recital of the flame ring as follows:
* * * and a centrally apertured flame ring partially closing the top of the pot, said ring having an outwardly extending portion secured to said transversely extending partition, said pot having an outwardly extending flange at its upper edge confined between the outwardly extending portion of said flame ring and said partition.
24. Claim 3 of the ’232 patent is supported by the disclosure of the patent specification, and may be read on the patent drawing as follows:
In a demountable stove [1 and 9] and pot type burner [23 and 25] therefor,
(a) a lower stove section [1] defining an air inlet space, and having a circumferential side wall with an air inlet aperture [3] therein and an open top,
(b) an intermediate, inwardly extending partition ring [21] removably mounted upon the upper edge [4] of said lower stove section [1], said partition ring [21] having a central aperture,
(c) an upper stove section [9] removably mounted upon said partition ring [21], the upper stove section [9] having a circumferential wall and a closed top [10] defining a combustion space,
(d) an air directing sleeve [18] mounted upon and upwardly extending from said partition ring [21], and
(e) a burner pot [23 and 25] supported on said sleeve [18] and inwardly spaced therefrom,
(f) a transversely extending partition [21] connecting said sleeve [18] and pot [23], the space between said sleeve [18] and pot [23] being in communication with the air space within the lower section [1],
(g) the wall [23] of the pot [23 and 25] being provided with a plurality of primary and secondary inlet aperatures [26 and 27],
(h) and means [31 and 35] for delivering tertiary air directly into the combustion space.
25. Claim 5 of the ’232 patent is supported by the disclosure of the patent specification, and may be read on the patent drawing in the same manner as claim 3 above, the additional claim 5 recital being applied as follows:
(i) * * * including an air duct [31] extending upwardly through the pot [23 and 25] and in communi *36 cation with the space below the bottom [25] of the pot, said air duct [31] terminating [33] at a level above the level [air inlet aperture 27] of admission of the secondary air,
(j) and a hood [35] mounted [34] on the upper end [33] of said duct [31] and adapted to deliver tertiary air therefrom downwardly [flange 36] toward the mixture passing upwardly through the top [29] of the pot [23].
26. Claim 6 of the ’232 patent is supported by the disclosure of the patent specification, and may be read on the patent drawing in the same manner as claim 3 above, the additional claim 6 recital being applied as follows:
(k) * * * the wall [23] of said pot [23 and 25] having therein a plurality of primary air inlet apertures [26] located at various levels,
(l) and having a plurality of secondary air inlet apertures [27] located adjacent the upper edge [24] of the pot [23],
(m) all of said apertures [26 and 27] being in communication with the space within the lower section [1] below the lower end of said sleeve [18],
(n) and a centrally aperturéd [30] flame ring [29] partially closing the top of the pot [23],
(o) said ring [29] having an outwardly extending portion [periphery of 29] secured [by screws 28] to said transversely extending partition [21],
(p) said pot [23] having an outwardly extending flange [24] at its upper edge confined between the outwardly extending portion of said flame ring [29] and said partition [21].
27. During its pendency in the United States Patent Office, the Breese patent application, filed May 10,1943, and which resulted in the ’232 patent, presented ten claims which were rejected as indefinite, vague and incomplete, and five claims which were rejected on prior patents. The patent examiner advised that a claim clearly and directly reciting the parts of the stove disclosed would probably be allowed, and that the fifteen claims originally presented were unduly multiplied. Thereupon, the applicant canceled nine claims without prejudice, and stated:
In view of the Examiner’s requirement to reduce the number of the claims, it will be understood that no abandonment of the subject matter of the canceled *37 claims is intended and no restriction of the scope of the remaining claims.
Remaining claims were amended to render them more definite and complete. After a further rejection for indefiniteness, further amendments to the claims were made in accordance with the patent examiner’s suggestions. In view of the examiner’s criticism, the title was changed from “burner for tent stoves” to “stove structure.” After further formal amendments, the application including the three claims in suit was allowed, and the ’232 patent issued January 22, 1946. Two claims added to the ’232 application during prosecution were rejected as vague and misdescriptive, and as met by prior patents. These two claims were then canceled without prejudice and in vieuy of the remaining claims.
28. Defendant urges that claims 3, 5 and 6 of the ’232 patent are invalid over the disclosures of prior patents. Defendant’s notices of prior art indicated reliance on sixteen of the seventeen domestic and on the two foreign patents previously cited in the Breese application file for the ’232 patent, plus reliance on twenty additional domestic patents and one additional foreign patent. In its requested findings and brief defendant relies on or mentions only the following nine prior domestic and foreign patents:
De Laneey- 2,290, 544-Filed October 18,1939.
Bock- 1,950,161- Issued March 6, 1934.
Young- 2, 219, 276-Issued October 22, 1940.
Hayter- 2, 342, 272_Filed January 21, 1941.
Breese- 1, 855, 891_ Issued November 1, 1932.
Breese- 1, 886,156_ Issued November 1, 1932.
Krisz, et al— German patent Published November 23,1909. 216,523.
Kriss, et al— Austrian patent 39090- Published October 11, 1909. Gilmore, et al_. 1,670,033_Issued May 15, 1928.
The other thirty patents listed in defendant’s notices are merely cumulative, and the following discussion will be limited to the nine selected by the defendant.
29. De Laneey patent 2,290,544 was cited by the patent examiner against the Breese ’232 application. De Laneey discloses a power-operated pot-type oil burner to be supported in a firebox. One form of the De Laneey burner is illustrated in the following reproduction of figure 1 of th§ patent drawings.
*38 July 21, 1942
2,290,544
B. W. DE LANCEY
Liquid Fuel Burner
Filed Oct. 18,1939

The burner includes a pot 21 having air inlet apertures 21' and supported in the casing 13 by ring 14. A firebox ring 10 supports a ring 11 to which the casing 13 is secured. A motor-driven blower 46 is mounted in the bottom of the *39 casing. A central air distributor 26 is provided with, air outlet apertures 27 and 28, and is provided with a flame spreader 29 adjacent to the flame ring 52. A flame spreader having a downwardly turned periphery is illustrated in figure 5 of the De Lancey patent drawings. The De Lancey patent does not disclose the construction of the firebox for the power-operated burner but does mention that the burner could be used under hot-water heaters or in cook stoves. The examiner did not reject the claims here in suit on the De Lancey disclosure.
30. Bock patent 1,950,161 was also cited by the patent examiner. Bock shows an oil burner positioned in a furnace firebox by a horizontal draft tube extending to a motor-driven blower. The burner construction is illustrated in the following reproduction of figure 2 of the Bock patent drawings.
March 6,1934
1,950,161
O. L. BOCK
Oil Burner
Filed Jan. 4,1932

*40 Referring to the drawing, the burner comprises a body 5 supported by draft tube 6 and having a cylindrical outer wall 7. The fire pot 9 is suspended from the flange 8 and is spaced from the outer wall 7. The pot 9 is provided with a plurality of openings or holes 22 for supplying secondary air to the combustion chamber. • A central stack 12 extends upwardly in the combustion chamber and is provided with a flame spreader 13. A choke ring 18 of refractory material is supported at the upper end of fire pot 9. A loose layer of refractory material 25 within a refractory lining 17 at the bottom of the fire pot 9 is said to contribute toward producing a full round flame. Primary air is fed through holes 26 adjacent the refractory layer 25.
31. Young patent 2,219,276 was not cited by the patent examiner. Young discloses an oil-burning furnace for domestic use. The construction is illustrated by six sheets of drawings. The following reproduction of figure 5 of the patent drawings is adequate for discussion of the Young patent disclosure.

*41

*42 Keferring to the drawing, the burner 28 comprises a cylindrical portion 30 having a bottom cup 31. The cylindrical side wall 30 is provided with a series of small air holes not illustrated in figure 5. The burner 28 is secured to an annular plate 38, and the flange 39 of plate 38 is secured to the cylindrical wall 26 of the combustion chamber. A cylindrical member 52 is supported between the burner wall 30 and the combustion space wall 26 to prevent products of combustion from entering the pot through the air holes mentioned above. A motor-driven blower 91 forces air upward along the outside of the combustion chamber wall 26, and also supplies air to the space below the burner bottom 31 by means of a series of equally spaced openings around the lower end of wall 26. Air below the bottom 31 flows through the space 50 to the air holes in the pot wall 30. During pilot or hold-fire operation, the blower 91 is idle. A ring 142, described as a primary ring, is supported in the pot 30 between the series of air holes mentioned. The Young patent does not disclose a central air duct for tertiary air.
32. Hayter patent 2,342,272 issued to plaintiff’s predecessoi in business and relates to a boiler construction. This patent issued after the ’232 application was filed and was not cited against said application by the patent examiner. The construction disclosed in the Hayter patent is illustrated by the following reproduction of figure 2 of the patent drawings.

*43

*44 Referring to the Hayter drawing, the burner pot 20 is suspended by flange 23 on the flange 19 of housing 16. The housing is supported by a clamp ring 29 carried by tension bolts 30 secured to the horizontal partition 15 in the boiler shell 1. The burner pot 20 has a plurality of primary air inlets 22 and has a series of secondary air inlets 21 near the top of the pot. A motor-driven air fan 37 is mounted below the pot. In the Hayter patent construction there are no means for delivering tertiary air into the combustion space although additional secondary air may be admitted through the partition 15 to the space between flange rings 24 and 26. The Hayter patent construction does not show a demountable stove having removably mounted upper section and remov-ably mounted partition ring of the character defined in the ’232 claim in suit. The Hayter patent burner is not adapted for use in the tent stove shown in the ’232 patent.
33. Breese patent 1,885,891 was not cited by the patent examiner. This early Breese patent issued to plaintiff’s predecessor and discloses a stove having separable combustion and radiation portions. The construction is illustrated in figure 1 of the patent drawings which is reproduced here.
*45 Noy. 1, 1932
1,885,891
J. L. BREESE, Jr.
Heater
Filed Nov. 7,1930

Referring to this Breese drawing, the heater includes a bottom A, a housing member A4, a radiation member A7, and a top or closure A8. A pot-type burner is supported on the bottom A and includes a pot B3 having a closed bottom B4. The outer burner shell B is imperforate and the inner wall B8 is provided with primary air inlet apertures B5 and secondary air inlet apertures B6 about the upper edge. Hydrocarbon fuel is supplied by pipe C. There are no means in *46 this Breese construction for delivering tertiary air directly into the combustion space, no central air duct through the pot, and no flame ring.
34. Breese patent 1,886,156 was cited by the patent examiner. This patent also, issued to plaintiff’s predecessor and discloses a stove similar to that shown in Breese 1,885,891 above. Two constructions are shown in the drawings of Breese 1,886,156 for supporting a pot-type liquid fuel burner. In one embodiment the cylindrical partition surrounding and supporting the perforate pot is secured to the bottom of the stove by clamps. In the other embodiment illustrated, the bottom of the stove is integral with the bottom of the pot, and an inwardly projecting ring rests upon the top edges of the burner shell and the perforate inner pot. The disclosure of 1,886,156 is of no more pertinence to the claims in suit than 1,885,891 mentioned above, and likewise does not provide means for tertiary air.
35. Krisz, et al. German patent 216528 was cited by the patent examiner. This early foreign patent discloses a pan burner for crude petroleum. The construction is illustrated in the patent drawing reproduced here.
*47 KAiSERLICHES PATENTAMT. M.
PATENTSCHRIFT
M216523

The Knsz petroleum burner includes a receptacle 1 containing a substantial depth of liquid fuel. A receptacle 9 surrounds the receptacle 1 and contains water. A jacket 2 provides an annular space 3 for the admission of air which passes through a slot 11 to mix with steam from the water receptacle and to enter the pot through inlets 13. Additional air inlets 5 are provided above the distributing plate 14. An air tube 6 extends upward through the center of the *48 liquid fuel receptacle 1 to a flame distributor 7. Additional air tubes 16 extending through the fuel receptacle 1 to the periphery of the distributing plate 14 may be provided. The TCrisz patent specification states that the ash residue may be emptied by removal of the flame-distributing plates 14, 15, and 7.
36. Kriss, et al. Austrian patent 39090 was also cited by the patent examiner. This Austrian patent issued to the same inventors named on the German patent mentioned in finding 35, and discloses a similar type of crude oil burner, but without the water jacket. The Austrian patent construction is illustrated in several forms, and figure 1 reproduced here is typical.

The Austrian patent construction includes a fuel container 1 within a jacket 2 and having air inlet openings 5 above the liquid fuel level. A central pipe 6 supplies air to openings 8 underneath the distributor plate 7. In another modification, furnace masonry replaces jacket 2.
37. Gilmore, et al. patent 1,670,033 was not cited by the patent examiner and is the final prior art patent mentioned *49 by defendant in its brief. The oil burner construction disclosed by Gilmore is illustrated by figure 2 of the patent drawings reproduced here.
May 15, 1928
1,670,033
J. G. GILMOEE, ET AL.
Oil Burster
Filed Sept. 1,1926

The Gilmore construction includes an outer casing 6 supporting an imperforate pot 2 by means of a flange 4. An annular deflecting ring 19 directs air from apertures 18 in flange 4 into the combustion zone. Air is supplied to the interior of the pot 2 through openings 11 in spray head 10 on the central air conduit 8. A second spray head 9 at the top of the conduit 8 supplies horizontally directed air through its openings 11. The air supply pipe 12 is connected to a blower for the purpose of delivering air under super-atmospheric pressure.
38. All other prior patents cited by the patent examiner against the ’232 patent application, and seventeen additional *50 prior art patents cited by the defendant in its notice of defenses are of no more pertinence to claims 3, 5, and 6 of the ’232 patent than the nine items set forth in finding 28 and discussed above.
39. The construction disclosed in the ’232 patent was developed subsequent to August 1942, when a representative of the defendant’s office of the Quartermaster General made inquiries of plaintiff’s predecessor, Oil Devices, concerning the availability of an oil burner which could be employed to convert an Army tent stove from a coal-burning stove to an oil-burning stove. The ’232 patent application was filed on May 10,1943. Oil Devices was advised by the Office of the Quartermaster General in a letter dated May 19,1943 of the substantial completion and success of the development work. Sample burners were furnished to defendant’s agencies for testing prior to May 19, 1943. The development work is described in more detail hereinafter.
40. The ’232 patent application at the time it was filed clearly disclosed the invention recited in claims 3, 5, and 6 of the patent. The drawing filed as a part of the application shows a construction corresponding exactly to the recitals of said claims. Claims 3, 5, and 6 of the ’232 patent, when read in the light of the patent specification and drawings, adequately and distinctly describe and claim invention in such full, clear, concise, and exact terminology as is required by the patent statutes.
41. The demountable stove and pot-type burner combinations recited in claims 3, 5, and 6 of the ’232 patent differ from the combinations disclosed in the prior art. The differences are not the result of mere mechanical skill. The differences between the subject matter of claims 3, 5, and 6 and the disclosures of the prior art are not such that the subject matter as a whole would have been obvious, at the time the invention was made, to a person having ordinary skill in the stove and oil burner art.
42. Claims 3, 5, and 6 of the ’232 patent are valid and patentable over the prior disclosures urged and relied on by the defendant.
*51 ACCUSED STRUCTURE
43. The accused structure in this suit is described and illustrated in defendant’s Military Specification, MIL-B-2029, February 17, 1950, entitled Burner, Oil, Stove, Tent, M-1941. A copy thereof is plaintiff’s exhibit 39. Drawings forming a part of said Military Specification show the constructional details of the accused structure. The structure is also illustrated in defendant’s Department of the Army Technical Manual TM 10-725, Stove, Tent M-1941, Complete and Burner, Oil, Stove, Tent M-1941, dated March 1952, plaintiff’s exhibit 62. Figure 7 from page 19 of the technical manual is reproduced here to illustrate the accused structure.

*52

Ref.

No. Name

(I) Gasoline can, 5-gallon
© Adapter vent tube
© Adapter plug body
© Adapter cam lever
© Drip interceptor hose
(5) Fuel hose
© Overflow hose „
© Float valve
•® Nipple, %-inch
Ref.

No. Name

© Pipe reducer
© Nipple, %-inch
© Burner pot
Pilot ring
Adapter ring
Combustion ring
Flame spreader
© Stave pipe

Figure 7. Installed oil burner.

44. The stove and oil burner structure shown in figure 1 of defendant’s technical manual is nearly identical with the structure illustrated in figure 1 of the ’232 patent in suit, reproduced in finding 22. The accused structure includes a burner pot 12, a conical pilot ring 13, a partition ring 14, a flame ring 15, and a flame spreader 16 on the upper end of a central air duct. Modification of the central air duct to divide the duct into a lower and an upper section, and to *53 provide a perforated sleeve on the upper section, as illustrated in the military specification and in the technical manual, is not material to the issues here in suit.
45. An accused burner, oil, stove, tent M-1941, operated during the trial, is a physical exhibit in this suit and is identified as plaintiff’s exhibit 65.
INFRINGEMENT
46. Claims 3 and 4 of the ’465 patent read in terms and spirit on the accused structure. The accused oil burner illustrated in finding 43 is a burner for liquid fuel and includes a combustion chamber having a generally cylindrical side wall and a bottom portion. Means are included for supplying a liquid fuel to the bottom, of the chamber. The side wall has a plurality of air inlets located in generally horizontal, vertically spaced rows. A generally frusto-conic baffle plate is supported within the chamber intermediate the top and bottom of the chamber and substantially* closing it. The conical plate has a central aperture, and the rim of the aperture terminates in substantially the same horizontal plane as the row of air inlets next above the lowest row. The lowest row of air inlets is in communication with the space below the conic baffle plate. The accused structure also provides a conic baffle plate so disposed with respect to the combustion chamber wall that there is substantial clearance between the outer periphery of the conic baffle plate and the wall at the time of starting the burner, as recited in claim 4. The terms substantially and substantial, as used in these claims, denote relative and approximate sizes or locations. Figure 1 of the ’465 patent drawing, finding 4, shows the rim of the central aperture of the conic baffle plate 19 in a horizontal plane very slightly below the bottom edges of the lower row of air inlets 17. Figure 1 of the ’232 patent drawing, finding 22, shows the rim 42 of conic baffle plate 40 in a horizontal plane very slightly above the upper edges of the lower row of air inlets 26. The technical manual illustration of the accused burner, finding 43, shows the rim of the conic baffle plate 13 slightly above the upper edges of the first row of air inlets above the baffle. The actual accused burner in evidence has the upper rim of the conic baffle plate between *54 one-eighth and three-sixteenths of an inch below the plane of the row of air inlets next above the lowest row. The accused burner includes a conic baffle plate of such diameter as to provide a clearance of nearly one-eighth inch between the periphery of the conic plate and the wall of the burner pot when the burner is not in operation. Variations in positions and clearances in manufactured products such as the accused burners may be of the order of small fractions of an inch, and such variations do not exclude such products from responding to the patent claim terminology such as substantially closing, substantially the same horizontal plane, and substantial clearance.
47. Claims 3 and 4 of the ’465 patent are infringed by the accused structures.
48. Claims 3, 5, and 6 of the ’232 patent read in terms and spirit on the accused structure. The accused pot-type oil burner illustrated in finding 43 is used in a demountable stove having a lower stove section defining an air inlet space and having a circumferential side wall with an air inlet aperture and having an open top. The structure includes an intermediate inwardly extending partition ring remov-ably mounted upon the lower edge of the lower stove section. The partition ring has a central aperture. The upper stove section is removably mounted on the ring and has a circumferential wall and a closed top defining a combustion space. There is an air-directing sleeve mounted upon and upwardly extending from the partition ring for supporting the burner pot thereon and spaced inwardly therefrom. A transversely extending partition connects the sleeve and the pot, and the space between the sleeve and the pot communicates with the air space within the lower section of the stove. The wall of the pot is provided with a plurality of primary and secondary air inlet apertures. There is a central air duct for delivering tertiary air directly to the combustion space. The accused structure responds exactly to the terminology of claim 3.
49. The accused structure includes an air duct extending upwardly through the pot and in 'communication with the space below the bottom of the pot. The air duct terminates at a level above the level of the secondary air inlets, and in- *55 eludes a hood on the upper end adapted to deliver tertiary air downwardly toward the fuel mixture passing upwardly through the top of the pot, all as recited in claim 5.
50. The accused structure also responds to the recital of claim 6 which defines the location of the air inlets and defines the flame ring. The accused structure provides a pot wall having a plurality of primary air inlet apertures located at various levels, and having a plurality of secondary air inlet apertures located adjacent the upper edge of the pot. All of said apertures are in communication with the space within the lower stove section below the lower, end of the pot-supporting sleeve. There is a centrally apertured flame ring partially closing the top of the pot and having an outwardly extending portion secured to the transversely extending partition at the top of the sleeve. Also, the accused pot has an outwardly extending flange at its upper edge confined between the outwardly extending portion of the flame ring and said partition. These details of construction are clearly apparent in the accused burner in evidence as plaintiff’s exhibit 65, and are also apparent from the illustration of the installed oil burner reproduced in finding 43.
51. Claims 3, 5, and 6 of the ’232 patent are infringed by the accused structure.
DEVELOPMENT OE ACCUSED STRUCTURE
52. The accused burner, oil, stove, tent, M-1941, was developed by plaintiff’s predecessor, Oil Devices, following a request made in August 1942, by Mr. W. E. Breuner, an engineer in defendant’s Quartermaster Corps. The M-1941 field stove had been used prior to that time for burning wood. Thousands of the stoves were in the field and in warehouses. The request was for a liquid fuel burner easily insertable into the existing stoves in place of the standard grate. The burner was to operate on both gasoline or diesel oil at high and at low rates of fuel feed, and was to bum without producing visible smoked Additional problems in the development of a satisfactory liquid fuel burner were the facts that the existing stove had only a 4-inch diameter flue and had a relatively flat combustion space of limited volume. There is no evidence that any satisfactory oil burner insertable in the *56 M-1941 stove was in existence when the Quartermaster Corps made its request.
53. The engineering development work carried on by Oil Devices, and particularly by James L. Breese, one of the partners constituting Oil Devices, resulted in an acceptable liquid fuel burner for the M-1941 stove. Oil Devices developed and furnished sample burners for tests by the defendant’s Bureau of Standards and for inspection by the Jeffersonville Quartermaster Depot at Jeffersonville, Indiana. On October 9, 1942, the Office of the Quartermaster General wrote to Oil Devices—
$ $ ‡ ‡ $
In view of the fact that there are considerable quantities of tent stoves in the field which may be desirable to convert to oil or gasoline burners from time to time, it is desirable that you continue your efforts in developing the final sample pot burner to be used in conjunction with these stoves. * * *
On May 19, 1943, the Office of the Quartermaster Genera! wrote to Oil Devices—
* $ $ $ *
With respect to the oil burner developed by your company, we have received six test reports from the various using services, and with the exception of the report from the Medical Board, which arrived when you were last here, they were all favorable in the main. * * *
The item was approved and standardized in yesterday’s technical committee meeting. In general, the disposition to its performance and adaptability has been most favorable and the Engineers intend to procure 20,000 units immediately. * * *
On June 18, 1943, the Office of the Quartermaster General wrote to Oil Devices—
[Representatives of your Company and the technicians in this Branch have collaborated on the design of the Tent Stove. It is understood that this item incorporates principles which are covered by existing patents and patent applications.
In order to protect the interests of the United States, it is requested that your Company grant a royalty free, nonexclusive license to the United States under all patents now and hereafter issued which contain a claim or claims infringed by Tent Stoves.
*57 The cooperation, [of] your Company in the development of this type of stove has been very much appreciated.
54. On September 3, 1943, Oil Devices was notified that it was to be awarded a contract for 74,620 burners at a unit price of $14.34. On September 4,1943, Oil Devices was advised that the award could not be made until Oil Devices extended the Government a royalty-free license on each and all of its patents applicable to said burners. On September 17,1943, Oil Devices executed and returned to the Jefferson-ville Quartermaster Depot a license agreement, prepared by the defendant, granting to the Government an irrevocable, nonexclusive, royalty-free right and license under Oil Devices’ patents for the duration of the war and for six months thereafter. In its opinion dated June 8, 1954, this court held that said license was not without consideration, was not obtained through duress, and that tins license expired six months after the formal surrender of Japan on September 2,1945.
55. The first contract for 74,620 burners was dated September 23, 1943, and was accepted by Oil Devices on September 30, 1943. The contract estimate of costs included a development charge of 60 cents per unit, making a total of $44,772. Oil Devices in its informal bid dated September 13, 1943, stated that it had incurred an engineering and development expense of $45,000 on the complete tent heaters between August 27, 1942 and September 13, 1943, and that this expense was to be amortized on said order. The profits of Oil Devices during the 10-months’ period ending December 31, 1943, were considered under the Renegotiation Act. A renegotiation agreement dated December 12, 1944, between the defendant and Oil Devices provided that Oil Devices pay the defendant $20,000 of its profits, less any applicable tax credit.
ACCOUNTING
56. The accounting period in this suit extends from January 1, 1950, through January 1955. During said period, 586,322 accused burners were delivered to the defendant on twenty-one Quartermaster Depot contracts identified as *58 DA-11-009-QM-Nos. 1985, 4282, 4284, 6662, 6663, 8839, 9948, 9951, 11055, 11057, 11392, 11965, 17396, 17399, 19384, 22965, 23194, 23195, 23926, 24018 and 24327. Deliveries under these contracts may be summarized as follows:
Deliveries — Burner, Oil, Stove, Tent, M-1941

The above table excludes burners delivered to the defendant by certain manufacturers pursuant to contracts with the plaintiff. It also includes overshipments on certain contracts, the overshipments totalling 477 units. The prices paid for the burners tabulated varied from $4.6398 to $18.8650 per unit. This price variation resulted from competitive bidding and also depended on the burner accessories, the packaging, and the location of the delivery point. The burners were delivered to the defendant at specified points within the United States and were then available for use by the defendant. The total value of said contracts was $6,-785,979.09. The average price per unit for said 586,322 units was $11.5738.
57. Plaintiff has not granted commercial licenses or rights specifically under its ’232 patent covering the M-1941 burner. Plaintiff has granted commercial licenses to certain manufacturers of oil burner assemblies, these licenses being under various of plaintiff’s patents including in some instances plaintiff’s ’465 covering the conical pilot ring. Certain of these commercial licenses may be summarized as follows:
(a) A license agreement dated December 16, 1941, between Oil Devices and American Gas Machine Company grants the latter a restricted^ nonexclusive license under four patents including Val jean patent 2,073,270 which relates to a fiat pilot rmg or baffle, together with the right to employ inventions claimed in some twenty- *59 one additional United States patents including specifically plaintiff’s ’465 patent covering the conical pilot ring. The specified royalty rates range from 50 cents per burner down to 44 cents per burner, the latter rate being for complete burners sold in excess of 24,000 per year.
(b) An agreement dated January 6, 1946, between Oil Devices and Quaker Manufacturing Company granted the latter a nonexclusive license under said Val-jean patent at a royalty rate of 25 cents per unit on space heaters sold in excess of 72,000 units per year.
(c) A nonexclusive license and release agreement dated September 1,1946, between Oil Devices and Borg-Warner Corporation granted the latter a license to manufacture _ and. sell apparatus containing inventions claimed in said Valjean patent. The royalty schedule provided for a royalty of 25 cents per device on each space heater embodying said invention. Other rates were specified for use of the invention in water heaters, furnaces, and central heating plants.
(d) An. agreement dated January 1, 1951, between the plaintiff and Prentiss Wabers Products Company granted the latter a nonexclusive license under said Val-lean patent at a royalty rate of 20 cents per burner for burners used in space heaters and sold in excess of 110,000 burners per year.
58. A schedule dated December 29, 1950, entitled “Breese Burner and Pilot Prices and Commissions on Sales to Manufacturers”, lists in tabular form the prices that Columbus Metal Products, Inc., charged customers to whom it sold oil burners or parts. The schedule lists the sale price on burners, pilots and combustion rings, and the commission paid to Breese Burners per item at various volumes of sales per year. The schedule indicates that the sale price on a 10-inch diameter cold rolled oil burner with a conical pilot was $2.05 on quantities between 63,501 and 127,500 burners per year. The commission paid to Breese Burners on each of such burners is indicated as 76 cents. The schedule gives a sale price on conical Stabaloy pilots for service as 53 cents, and 30 cents is indicated as the commission to Breese Burners. A notation on this schedule indicates that the price on conical pilots for production was 38 cents and that the commission to Breese Burners was 15 cents per pilot. The prices and commissions given above apply to 10-inch burners. *60 The accused M-1941 burners are approximately 10-inch burners. There is no evidence of a written license agreement between Breese Burners, Inc., and Columbus Metal Products, Inc. The plaintiff’s records of royalties received during the accounting period tabulate sums received from Columbus Metal Products, Inc., as “commissions”, and tabulate sums received from manufacturers having written license agreements as “royalties.”
59. Plaintiff’s accounting expert described several different methods of computing reasonable and entire compensation for this suit. One method provides that plaintiff receive 10 percent of the sale price of each complete M-1941 burner including those parts essential to its operation and functioning as a burner. The 10 percent rate was based on an agreement dated June 1, 1954,- between Breese Burners and Armaturenwerk Niederscheld, a corporation in Western Germany, specifying payment to Breese of a royalty of 10 percent of the invoiced net price on combination packages comprised of vertical burner pot and pilot ring, oil control valve, draft adjuster and flue cap. Application of the 10 percent rate to the value of the contracts mentioned in finding 57 would result in compensation in the amount of $678,597.91. Another method provides that plaintiff receive the profits it would have made if it had had the business of producing the accused 586,322 burners at a 7y2 percent rate of profit. The 71/2 percent rate was based on statements contained in a Chicago Quartermaster Price Adjustment District Office report of renegotiation of Oil Devices for the 10-months’ period ending December 31, 1943. The renegotiation resulted in an agreement under which Oil Devices agreed to pay the defendant $20,000 of its profits for said 1943 period. The report of this renegotiation stated:
* * * The profit on renegotiable business was adjusted to allow the contractor to retain a profit of approximately 7on the tent heater sales. * * *
Application of the 7y2 percent profit rate to the value of the accused contracts would result in compensation in the amount of $508,948.43. Still another method of computing reasonable and entire compensation described by plaintiff’s ■accounting expert provides a royalty of 80 cents to $1 for *61 each of the accused 586,322 burner units. This unit royalty rate was based on the following statement contained in the above-mentioned report of the 1943 renegotiation:
* * * All patent rights on these tent heaters have been waived for the duration of the war. Normally, a fee, ranging from 800 to $1.00 per unit would be received on such an item. * * *
The officer who prepared the report of the renegotiation testified that the above rates probably were derived from reports filed by Oil Devices. Application of the 80-cent royalty rate would result in compensation in the amount of $469,057.60, and application of the $1 rate would result in compensation in the amount of $586,322. The amounts of compensation computed by the above methods do not include interest as a part thereof.
60. Defendant’s accounting expert arrived at a total royalty of $59,850 conditioned upon a finding by the court that the claims in suit are valid and infringed. Defendant’s expert derived the above figure by averaging some five different methods of computing royalties. The first method was based on an agreement between Breese Burners, Inc., and Lonergan Manufacturing Company, dated April 10, 1951, under which then pending litigation was settled, and Lonergan was licensed under the above-mentioned Val jean patent. Defendant’s expert interpreted the Lonergan agreement as providing for a royalty of 10 cents per burner with an extra 10 cents per burner for any excess over 150,000 burners. The expert’s application of said rates to an assumed 700,000 burners produced a total of $125,000, or 17.85 cents per burner. The expert then cut this figure in two because he considered the patents in suit improvements rather than basic, because the patents had- not been licensed under their own numbers with one exception, and because of other factors. The second method was based on the agreement between Breese Burners, Inc., and Prentiss Wabers Products Co., dated January 1, 1951, providing a scale of royalties based on yearly sales of burners. The expert’s application of this scale produced a royalty of 18 cents per burner, which he then cut in two and arrived at a total royalty of $63,000 *62 for 700,000 burners. The third method was based on an agreement between Oil Devices and The Coleman Lamp and Stove Company, dated April 1,1939, and amended by letters in 1946. The expert’s application of the royalty formula in this agreement produced a rate of 15.5 cents per burner and a total royalty of $108,500 for 700,000 burners. Defendant’s expert again cut this sum in two for various factors and arrived at a royalty of $54,250. The fourth method was based on an agreement between Oil Devices and Quaker Manufacturing Company, dated January 2,1946, and a modification agreement, dated January 2,1947, between the same parties. These agreements licensed Quaker under the Valjean patent at a sliding scale of royalty rates. Defendant’s expert derived from this a royalty rate of 18 cents per burner which he cut 10 percent because of a save harmless provision, and he then cut in two the resulting 16.2 cent rate to produce a rate of 8.1 cents per burner and a total royalty of $56,700 for 700,000 burners. The fifth and last method utilized by defendant’s expei't was based on an agreement between Oil Devices and Borg-Wamer Corporation, dated September 1, 1946, releasing Borg-Warner from claims for past infringement and providing for a royalty of 25 cents per unit on space heaters covered by the Valjean patent. Because of a most favored nation, provision, defendant’s expert cut the 25-cent rate to 18 cents, and then cut this in two to derive a 9-cent per unit rate as in his second method. This 9-cent rate, applied to 700,000 units, totals $63,000.
61. All five of defendant’s methods of computing a royalty rate are based on plaintiff’s established rates with respect to the Valjean flat pilot baffle, but defendant’s expert cut the rate in two in each method because of nebulous factors such as volume of procurement, importance of invention, going rate of the industry, history of licensing of the patents in suit, extent of infringement of patent claims, and others. The five rates derived by defendant’s expert before being cut in two average 17.11 cents per burner.
62. Application of a rate of 25 cents per burner to the procurement tabulated in finding 56 gives the following result:

*63
Year Units Royalty

677 919. 25
1952_ 92, 240 23, 060. 00
1953_ 178,051 44, 512. 75
1954_ 17, 290 4, 322. 50
1955_ 7, 064 1, 766. 00
Total_ 586,322 146, 580. 50
CONCLUSION OP LAW
Upon tbe foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that claims 3 and 4 of plaintiff’s patent 2,182,465, and claims 3, 5, and 6 of plaintiff’s patent 2,393,232 are valid; that the inventions covered by said claims were used by the defendant without license of the plaintiff, and that plaintiff is entitled to recover compensation. It is therefore adjudged and ordered that plaintiff recover of and from the United States one hundred forty-six thousand five hundred eighty dollars and fifty cents ($146,580.50), together with interest on $72,919.25 from December 31, 1951, on $23,060.00 from December 31, 1952, on $44,512.75 from December 31, 1953, on $4,322.50 from December 31, 1954, and on $1,766.00 from December 31,1955, at the rate of four (4) percent per annum, all such interest to run until date of payment.

 No. 2,182,465.

 A frusto-conic baffle is a piece of sheet metal formed in the shape of a cone, with the top cut off.